IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RALLY AG LLC,

               Plaintiff,

    v.

APPLE, INC.,

               Defendant.

CIVIL ACTION
NO. 23-1106

**OPINION**

**Slomsky, J.**                                               **October 27, 2025**

## TABLE OF CONTENTS

I.   **INTRODUCTION** ........................................................................................................ 1

II.  **BACKGROUND** ......................................................................................................... 1

   A.   United States Patent Number 11,361,107 Covered Invention ............................................ 1

   B.   Asserted Claim ............................................................................................................. 4

III. **STANDARD OF REVIEW** ........................................................................................ 5

   A.   Claim Construction ...................................................................................................... 5

   B.   Indefiniteness Standard ................................................................................................. 8

IV. **ANALYSIS** .................................................................................................................. 9

   A.   Relevant Person of Ordinary Skill in the Art .................................................................. 9

   B.   Claim Construction of the Four Disputed Terms ............................................................ 10

      1.   "cloaked end user address," "cloaked relying party email address," and "cloaked . . . address" .................................................................................................................. 10

      2.   "relying party" ....................................................................................................... 14

   i. Claim Construction ................................................................ 14

   ii. Indefiniteness ...................................................................... 15

**V. CONCLUSION** ................................................................................ 18

## I.    INTRODUCTION

On October 5, 2023, Plaintiff Rally AG LLC ("Rally") filed a Complaint against Defendant Apple, Inc. ("Apple"), alleging Apple is infringing United States Patent No. 11,361,107 ("'107 Patent"), which is owned by Rally.[1] (Doc. No. 1.) Specifically, Rally alleges Apple's "Hide-My-Email" product infringes on the email cloaking system covered by the '107 Patent. (Doc. No. 35.) An email cloaking system, as described in the '107 Patent, is a system that allows parties to communicate anonymously through email. (See id.)

Presently, the parties seek construction of four (4) terms in the '107 Patent claim pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).[2] On June 6, 2025, the parties filed a Joint Claim Construction Chart. (Doc. No. 87.) On August 22, 2025, the parties filed a Joint Claim Construction Brief. (Doc. No. 100.) On October 8, 2025, the Court held a Markman hearing on the disputed terms, at which Apple presented expert testimony and both parties argued in favor of their respective positions. The four (4) disputed terms are now ripe for construction.

## II.    BACKGROUND

### A. United States Patent Number 11,361,107 Covered Invention

The Court previously summarized the background of the '107 Patent as follows:

Plaintiff is the owner of the '107 Patent, titled "Privacy Friendly Communication by Operation of Cloaked/Decloaked Email," which was issued by the United States Patent and Trademark Office on June 14, 2022. (SAC at ¶¶ 47-48.) The '107 Patent was originally assigned to autoGraph Inc. ("Autograph") by its inventor, Brian

---

[1]    The Second Amended Complaint (Doc. No. 35 or "SAC") is the operative Complaint in this case.

[2]    In Markman v. Westview Instruments, Inc., the United States Supreme Court held that "the construction of a patent, including terms of art within its claim, is exclusively within the province of the court." 517 U.S. 370, 372 (1996).

Roundtree.[3] (Id. at ¶¶ 40, 48.) Autograph was founded by Mr. Roundtree in early 2010 to "solve privacy issues around advertising while improving advertising performance." (Id. at ¶ 40.) To solve these issues, Autograph "developed a series of products (and obtained related patents) around the general problem of user-controlled access to personal data and [personally identifiable information] without losing control of the data itself." (Id. at ¶ 42.) In other words, Autograph's products focused on giving users a way to allow third parties to use their personally identifiable information without giving these third parties direct access to such information. (Id.) In connection with these products, Autograph developed an "email cloaking technology," which is the subject of the '107 Patent. (Id. at ¶¶ 45, 50.)

The '107 Patent is aimed at protecting the privacy of individuals communicating with third parties on the Internet. (Id. at ¶ 51.) In simple terms, the '107 Patent describes an "ID cloaking system" that allows two parties communicating through email to do so without revealing their identities. The ID cloaking system accomplishes this process by assigning each party an anonymous email address, intercepting each email sent between the parties, and replacing the "To" and "From" fields in the emails with each party's anonymous email address before forwarding the email to the appropriate party. By assigning the parties anonymous email addresses, the '107 Patent aspires to solve the issue of data breaches, which is a common problem that plagues traditional email communications, specifically between consumers and merchants. (See id. at ¶ 34.) As the SAC notes, "it is rarely an option for a consumer . . . not to give out her personal information such as email information . . . and still conduct most any transaction in today's information centric economy." (Id. at ¶ 35.) But by giving out their email addresses, these consumers put their private emails at risk of mass exposure through data breaches. And because "[m]odern consumers frequently have become the victims of data breaches," most consumers today are bombarded with "a steady stream of emails infected with malicious code (mass-mailing worms and viruses), unwanted product advertisements (spam), and requests for personal information from criminals masquerading as legitimate entities to enable the commission of fraudulent activity (phishing)." (Id. at ¶¶ 33-34.)

More specifically, the '107 Patent's ID cloaking system operates as follows. The '107 Patent refers to the party initiating the anonymous email communications, typically the consumer, as the "end user," and the party receiving the anonymous email communications, typically the merchant, as the "relying party." (See id., Exhibit A [hereinafter "'107 Patent"].) As described in the SAC, an end user wishing to anonymously communicate with third parties, such as merchants as the relying party, can download a "web plugin browser extension" or "mobile device application" that is "configured to interact with the ID cloaking systems." ('107

---

[3]    Autograph transferred ownership of the '107 Patent to Plaintiff, who "is the current owner of all rights, titles, and interests in and to the '107 Patent." (SAC at ¶ 48.)

Patent at 7:51-55.)  With the downloading of the browser extension or mobile app, the '107 Patent's specification assumes that the end user will create "a profile/person with the identity cloaking system," at which time the end user can specify which information they want to keep private from third parties, such as their email address.  (See id. at 7:58-67.)

If the end user decides they do not want to share their personal email with a relying party, the browser extension or mobile app will instead give the end user the option to use their cloaked email address.  (See id. at 8:26-31.)  For example, if an end user fills out a form on a merchant's website and the form requires the end user to input their email address, the ID cloaking system, acting through the browser extension or mobile app, will give the end user the option to fill in the form's email address field with the end user's cloaked email address.  Therefore, if the merchant chooses to email the end user in response to the completed webform, the merchant can only email the end user's cloaked email address, which the ID cloaking system will intercept.

To ensure that the ID cloaking system intercepts the email sent to the end user from the merchant/relying party, the end user's cloaked email address must end in the same domain as the domain associated with the ID cloaking system.[4]  (See SAC at ¶ 56.)  This is accomplished when the end user creates a profile with the ID cloaking system, at which time the ID cloaking system assigns the end user a cloaked email address that ends in the same domain as the ID cloaking system.  (See '107 Patent at 7:58-67.)    For example, an end user using the de-cloaked email "example@gmail.com" would be assigned by an ID cloaking system using the domain "autograph.me," a cloaked email address of "example@autograph.me." Because both the ID cloaking system and the end user's cloaked email address use the same domain "autograph.me," any email sent to this cloaked email address would first be intercepted by the ID cloaking system.  Once intercepted, the ID cloaking system would "intelligently" swap the end user's cloaked email address for their de-cloaked email address.  (SAC at ¶ 61.)  To illustrate, the ID cloaking system would intercept an email sent to the end user's cloaked email address "example@autograph.me" and intelligently swap this cloaked email address for "example@gmail.com," which is the end user's de-cloaked email address.  Instead of "To: example@autograph.me," the email would now read "To: example@gmail.com."

When the ID cloaking system intercepts the relying party's email to the end user, the system will also "determine whether the end user profile contains a previous association between the relying party address and a cloaked relying party address." (Id. at ¶ 56.)  In other words, the ID cloaking system will search the end user's profile to determine whether the system has already assigned that particular relying party a cloaked email address.  (See id.)  If it has already done so, the ID cloaking

---

[4]    A domain is the portion of an email address that follows the "@" sign.  For example, the domain in "example@gmail.com" is "gmail.com."

system will swap the relying party's de-cloaked email address for its cloaked email address. (<u>See</u> <u>id.</u>) If the system has not already assigned the relying party a cloaked email address, the system will generate one, store the association between the relying party's cloaked and de-cloaked email addresses in the end user's profile, and then swap out the appropriate email addresses. (<u>See</u> <u>id.</u>) When generating a cloaked email address for the relying party, the ID cloaking system will assign the relying party a cloaked email address that ends in a different domain than the relying party's de-cloaked email address. (<u>See</u> <u>id.</u>) For example, a relying party using the de-cloaked email "info@nordstrom.com" would be assigned by the ID cloaking system a cloaked email address of "info@autograph.me." Once each party's respective cloaked and de-cloaked email addresses have been swapped in and out, the ID cloaking system will then forward the email to the end user's de-cloaked address, listing the relying party's "reply-to" address as its cloaked email. (<u>See</u> <u>id.</u>)

As a result, if the end user chooses to reply to the relying party's initial email, all the end user must do is click "reply" and send the email back to the relying party's cloaked email address. (<u>Id.</u> at ¶ 67.) The ID cloaking system will again intercept the email and swap out each party's respective cloaked and de-cloaked addresses before forwarding the email to the relying party's de-cloaked email. (<u>See</u> <u>id.</u> at ¶ 56.) Through this function, the ID cloaking system enables the parties to engage in anonymous email chain threading. (<u>Id.</u> at ¶ 61.)

(Doc. No. 52.)

## B.  Asserted Claim

In the SAC, Rally accuses Apple's "Hide-My-Email" feature of infringing at least Claim 13 of the '107 Patent. (Doc. No. 35 at ¶ 89.) Claim 13 is an independent claim. As relevant here, the four (4) disputed terms, demarcated below in bold lettering, appear in Claim 13:

13. A non-transitory computer readable medium for a ID cloaking system having instructions stored thereon that are executable by processor electronics to:

receive an email addressed to a **cloaked end user address**, wherein the email is sent from a **relying party email address**, and wherein the domain of the **cloaked end user address** and the domain associated to the cloaked ID system are the same domain;

identify an end user specified address associated to the **cloaked end user address** by an end user profile;

determine whether the end user profile contains a previous association between the **relying party address** and a **cloaked relying party address**, wherein the

4

> **relying-party email address** has a different domain than the **cloaked relying party email address**;
>
> where the end user profile does not contain a previous association between the **relying party address** and the **cloaked relying party email address**, then generate a new **cloaked relying party email address** and associate the new **cloaked relying party email address** to the end user profile, the **cloaked end user address**, wherein the new **cloaked relying party email address** is generated with a domain different than the **relying party address**; and
>
> send the email to the identified end user specified address, wherein the mail is configured with a reply-to email address comprising the new cloaking **relying party email address**.

(Doc. No. 35-1 at 39.)

## III.    STANDARD OF REVIEW

### A.    Claim Construction

The first step in a patent infringement analysis is to define the meaning and scope of the claims of the patent.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996).  Claim construction, which serves this purpose, is a matter of law exclusively for the court.  Id. at 979.  "'[T]here is no magic formula or catechism for conducting claim construction.'  Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'"  SoftView LLC v. Apple Inc., No. 10-cv-389, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (quoting Phillips v. AWH Corp., 415 F.3d 1303, 1324 (Fed. Cir. 2005)).

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips, 415 F.3d at 1312 (internal quotation marks omitted).  The focus of a court's analysis must therefore begin and remain on the language of the claims, "for it is that language that the patentee chose to use to 'particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.'" Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112,

5 ¶ 2). "Claim terms are generally accorded their ordinary meaning—that is, their meaning to a skilled artisan at the time of invention" i.e., as of the effective filing date of the patent application. Intel Corp. v. Qualcomm Inc., 21 F.4th 784, 791 (Fed. Cir. 2021) (citing Phillips, 415 F.3d at 1312-13).

Generally, a person of ordinary skill in the art ("POSITA") would not understand the ordinary and customary meaning of a claim term in isolation. Phillips, 415 F.3d at 1313. As such, the ordinary meaning may be derived from "the sources available to such artisans, including 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" Intel, 21 F.4th at 791 (quoting Phillips, 415 F.3d at 1313-14).

The "most significant source" of authority is "the intrinsic evidence of record, i.e., the patent itself, including the claims, the patent specification and, if in evidence, the prosecution history." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996); see also Phillips, 415 F.3d at 1313 (holding that a person of ordinary skill in the art is deemed to have read the claim terms "in the context of the entire patent", including the specification). The specification is "that part of a patent application which precedes the claim and in which the inventor specifies, describes, and discloses the invention in detail." McCarthy's Desk Encyclopedia of Intellectual Property 408 (2d ed. 1995). It "is the single best guide to the meaning of a disputed term" and is usually dispositive as to the meaning of words. Vitronics, 90 F.3d at 1582 ("In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence") (citations omitted). Although it is improper to import limitations from the specification into the claims, "one may look to the written description to define a term already in a claim limitation, for a claim must be read in view

6

of the specification of which it is a part." Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998). On occasion, "the specification may reveal a special definition given to a claim term . . . that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." Phillips, 415 F.3d at 1316. The specification may also "reveal an intentional disclaimer, or disavowal, of claim scope by the inventor . . . [ which] is regarded as dispositive." Id. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." Renishaw, 158 F.3d at 1250.

The court "should also consider the patent's prosecution history, if it is in evidence." Markman, 52 F.3d at 980. This consists of "the complete record of proceedings before the Patent Office and includes the prior art cited during examination." Phillips, 415 F.3d at 1317. "Like the specification, the prosecution history provides evidence of how the [Patent and Trademark Office] and the inventor understood the patent." Id. at 1317. The prosecution history may "'demonstrat[e] how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution . . . .'" SpeedTrack, Inc. v. Amazon.com, 998 F.3d 1373, 1377 (Fed. Cir. 2021) (quoting Phillips, 415 F.3d at 1317). Nonetheless, it is the least probative form of intrinsic evidence because it "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation." Id.

If ambiguity still exists after considering all the intrinsic evidence, the court may rely on extrinsic evidence, which is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. "[D]ictionaries, and especially technical dictionaries, . . . have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology."

<u>Phillips</u>, 415 F.3d at 1318.   Additionally, expert testimony can provide background on the technology at issue, explain how it works, speak to what a person of ordinary skill in the art would understand, and establish that a particular term has a particular meaning in the pertinent field.   <u>Id.</u> Extrinsic evidence, however, is "generally of less significance than the intrinsic record."  <u>Wi-Lan, Inc. v. Apple, Inc.</u>, 811 F.3d 455, 462 (Fed. Cir. 2016) (citing <u>Phillips</u>, 415 F.3d at 1317).

Ultimately, during claim construction, "[t]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." <u>Phillips</u>, 415 F.3d at 303.

### B.    Indefiniteness Standard

"Under 35 U.S.C. § 112, patent claims must 'particularly point[] out and distinctly claim[] the subject matter' regarded as the invention."  <u>Berkheimer v. HP Inc.</u>, 881 F.3d 1360, 1363 (Fed. Cir. 2018).  A lack of definiteness renders the claims invalid.  <u>Nautilus, Inc. v. Biosig Instruments, Inc.</u>, 572 U.S. 898, 902 (2014).  A patent's claim is indefinite if "read in light of the specification . . . and the prosecution history, [it] fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  <u>Id.</u> at 901.   This standard "mandates clarity, while recognizing that absolute precision is unattainable."  <u>Id.</u> at 910.

A party seeking to prove that a claimed term is indefinite must do so by clear and convincing evidence.  <u>See</u> <u>Sonix Tech. Co. v. Publ'ns Int'l, Ltd.</u>, 844 F.3d 1370, 1377 (Fed. Cir. 2017).   Accordingly, to determine whether a claim is indefinite, a court must evaluate the "specification and the prosecution history" to see if it "provide[s] objective boundaries for those of skill in the art," but this does not require an express definition "if the meaning of the term is fairly inferable from the patent."  <u>IQASR LLC v. Wendt Corp.</u>, 825 F. App'x 900, 904 (Fed. Cir. 2020) (citations omitted); <u>see</u> <u>also</u> <u>BASF Corp. v. Johnson Matthey Inc.</u>, 875 F.3d 1360, 1366 (Fed.

8

Cir. 2017) ("The mere observation of information not 'recited' does not answer the question whether a person of ordinary skill in the art would need to be given the level and measurement information to understand, with reasonable certainty.")   "Notably, a claim is indefinite if its language 'might mean several different things and no informed and confident choice is available among the contending definitions.'"  Media Rights Tech., Inc. v. Capital One Fin. Corp., 800 F.3d 1366, 1371 (Fed. Cir. 2015) (quoting Nautilus, 572 U.S. at 911 n.8).

## IV. ANALYSIS

### A. Relevant Person of Ordinary Skill in the Art

"Claim construction seeks to ascribe the meaning to a claim term as understood by a person of ordinary skill in the art [("POSITA")] at the time of invention."  Iridescent Networks, Inc. v. AT&T Mobility, LLC, 933 F.3d 1345, 1350 (Fed. Cir. 2019).  Thus, as an initial matter, the Court must determine the relevant POSITA by which to judge the meaning of the '107 Patent claim terms as of June 14, 2022, the date of priority for the '107 Patent.

In their Joint Claim Construction Brief, the parties proffered similar definitions of the relevant POSITA.  (See Doc. No. 100 at 16, 18.)  Because Apple acknowledged in its brief that the adoption of Rally's POSITA definition will not change the outcome for claim construction, the Court will adopt Rally's definition.  (See Doc. No. 100 at 18, n.4 ("The analysis of Apple's expert, [], would not change if Rally's definition of a [POSITA] were adopted."))  As such, the relevant POSITA in this case is defined as follows:

> A [POSITA] is one who has relevant knowledge and/or experience in the field of electronic communications, particularly e-mail systems and computer engineering, and/or the component parts that comprise such systems and programs. For example, a person with at least two years' work experience and an undergraduate education in computer science, electrical engineering, computer engineering or similar degree from an accredited college or university, along with an understanding of data security and privacy issues found in electronic communications would be a POSITA with regard to the Asserted Patent.

(Doc. No. 100 at 16.)

Apple presented the declaration and testimony of an expert witness to support its respective constructions of the four (4) disputed claim terms.  (See Doc. No. 100, Apple Ex. 1.)  Its expert witness fits the definition of the relevant POSITA in this case. From September 1978 through December 1982, he pursued doctoral studies in computer science at the University of Delaware. (See Doc. No. 100, Rally Ex. 1 at 13.)  He also had at least fifty (50) years of experience in the development of the Internet and networking technologies, products, services, and standards.  (See id., Apple Ex. 1 at 2.)  Thus, because the expert witness has relevant knowledge and experience in the field of electronic communications, he qualifies as a relevant POSITA in this case.

## B.    Claim Construction of the Four Disputed Terms

The parties dispute the construction of four (4) claim terms from the '107 Patent:  (1) "cloaked end user address"; (2) "cloaked relying party email address"; (3) "cloaked . . . address"; and (4) "relying party."  (See Doc. No. 87.)  The Court will construe each term in turn.

### 1.    "cloaked end user address," "cloaked relying party email address," and "cloaked . . . address"

| Claim Term | Rally's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "cloaked end user address" | "replacement email address for the end user specified address intended to enable receipt of email messages through the ID cloaking system and to hide the end user specified address from the relying party" | "an anonymous email address from which the real email address of the end user cannot be determined" |
| "cloaked relying party email address" | "replacement email address for the relying party [email] address intended to enable sending of email | To the extent "relying party" is found to be not indefinite, "an anonymous email address from which the real email address of the relying party cannot be determined" |

| | messages through the ID cloaking system" | |
|---|---|---|
| "cloaked…address" | Rally believes that its proposed constructions of . . . "cloaked end user address" and "cloaked relying party address" encompass any construction of "cloaked . . . address" as it appears in the asserted claims of the '107 Patent. | "an anonymous email address from which the real email address cannot be determined" |

The Court construes "cloaked end user address," "cloaked relying party address," and "cloaked…address" to mean "an anonymous email address assigned through the ID cloaking system to enable the exchange of emails from which the real email address of the parties cannot be determined." The parties are the end user and the relying party. But the real dispute here between Rally and Apple is whether "cloaked…address" should have the same meaning throughout the claim.

It is well established that a term such as "cloaked…address" is "presumed to have the same meaning throughout all of the claims in the absence of any reason to believe otherwise." See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc., 672 F.3d 1270, 1275 (Fed. Cir. 2012); see also Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1345 (Fed. Cir. 1998) (describing that where "array" was used in two instances in one claim, "array of slice data" and "composite array," "whatever interpretation we assign should encompass both uses because the same word appearing in the same chain should be interpreted consistently"). Nothing in the intrinsic record suggests "cloaked…address" should be construed differently when used with "end user" or "relying party" within the same claim.

11

The Court's construction is derived directly from the specification and is consistent with the language of the '107 Patent summarized supra.[5] See Phillips, 415 F.3d at 1315 ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.") (internal citations omitted). Here, the specification explicitly states that the ID cloaking intermediary "has similar benefits for emails sent from the relying-party back to the end user" and that the disclosed tools protect the privacy of the "cloaked…addresses" for both parties, and even for "others" who may be parties to the email chain.

Rally argues that construing "cloaked…address" to have a singular construction without consideration for the words between "cloaked" and "address," to wit, "end user" or "relying party," is at odds with the specification of the '107 Patent. Specifically, Rally argues that the "cloaked email address" for the relying party is not "anonymous," because the "display name" of the relying party may show the relying party's real email address or identity. (Doc. No. 100 at 26.) Yet, Rally acknowledges that "the [cloaked] email address no longer contains the relying party's identifying information or original email address." (Id.) In this regard, Rally agrees that the email addresses of the end user and relying party are anonymous through the ID cloaking system. However, the relying party has the option of identifying itself in what is referred to as a "display name." For example, as shown in Figure 6 of the specification below, the display name is distinct from the email address:

---

[5] The ID cloaking system accomplishes this process by assigning each party an anonymous email address, intercepting each email sent between the parties, and replacing the "To" and "From" fields in the emails with each party's anonymous email address before forwarding the email to the appropriate party. (SAC at ¶34.)



'107 Patent, Fig. 6 (annotated).  While Rally correctly states that the display name (highlighted in purple) may include the merchant's real email address (info@marketing.com) or as described in in the specification, "info@nordstrom.com" (SAC at ¶ 56), the display name has no bearing on the anonymity of the "cloaked email address" (highlighted in yellow).  The email address, the term in the dispute and used in the claim, is the anonymous portion, from which the real address of the relying party cannot be determined.

Accordingly, in light of the intrinsic evidence, the Court construes "cloaked end user address," "cloaked relying party address," and "cloaked…address" to mean "an anonymous email address assigned through the ID cloaking system to enable the exchange of emails from which the real email address of the parties cannot be determined."  And because the intrinsic evidence is not ambiguous, extrinsic evidence need not be resorted to in construing the challenged terms.

2.      "relying party"

| Rally's Proposed Construction | Apple's Proposed Construction |
|---|---|
| Plain and ordinary meaning, as understood by a person of ordinary skill in the field of electronic communications. | Indefinite |

i.      Claim Construction

Apple does not construe the term "relying party" because it submits the term is indefinite. The Court disagrees and construes the term "relying party" to have its plain and ordinary meaning.  The term relying party is used merely to identify the party who relies on the end user's cloaked email address to communicate with the end user—initially or in return—through the ID cloaking system.

The Court's construction is supported by the intrinsic evidence.[6] For example, Claims 1, 7, and 13 describe how the ID cloaking system acts as an intermediary when a relying party sends an email to the cloaked end user address.  Specifically, the system "receive[s] an email addressed to a cloaked end user address, wherein the email is sent from a relying party email address, and wherein the domain of the cloaked end user address and the domain associated to the processor-based cloaked ID system are the same domain."  ('107 Patent at 29:46–49.) Additionally, in the event that the system determines that the "end user profile does not contain[] a previous association between the relying party email address and a cloaked relying party email address, wherein the relying party email address has a different domain than the cloaked relying email party address", the system "generate[s] a new cloaked relying party email address and associate[s] the new cloaked relying party email address to the end user profile."  ('107 Patent at

---

[6] The parties agree that the file or prosecution history is not helpful to claim construction in this case. (See Doc. No. 108 at 163.)  Moreover, because "relying party" is not ambiguous, extrinsic evidence need not be considered.

14

31:17–27).  And claim 14 provides that "the new cloaked relying party email address has a domain that is the same as the cloaked end user address."  ('107 Patent at 32:5–7.)  Based on the wording of the claim specifications and even of the claims themselves, a POSITA would understand that the relying party communicates with the end user through the ID cloaking system.

The specification further supports the Court's construction. As the Federal Circuit has held: "[e]ven when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents."  <u>Phillips</u>, 415 F.3d at 1321 (citing <u>Irdeto Access, Inc. v. Echostar Satellite Corp.</u>, 383 F.3d 1295, 1301 (Fed. Cir. 2004)).  Applying this rationale here, the specification references the term "relying party" over ninety (90) times.  (<u>See</u> '107 Patent, 4:8-10) ("Emails between the end user and relying-party are routed to the ID cloaking system before being delivered to the other party."); (<u>Id.</u> at 5:3-7) ("In this manner, any emails exchanged between the end user and relying-party will be delivered first to the ID cloaking system before being delivered to the other party for re-routing and privacy processing."); (<u>Id.</u> at 5:8-11) ("This intelligent assignment of the de-cloaking & cloaking addresses helps maintain email threading by keeping the ID cloaking system as an intermediary during email correspondence between the end user and relying-party.")

In sum, after considering claim context, the specifications, and for all the foregoing reasons, the Court construes "relying party" to have the plain and ordinary meaning as described above.

### ii.     Indefiniteness

Despite the plain and ordinary meaning of the words "relying party," which renders them not indefinite, Apple still argues that the term is indefinite for two reasons. The Court will address Apple's arguments in turn.

First, Apple argues that the '107 Patent does not define the term "relying party," nor does it provide any guidance on objective boundaries for the term. (Doc. No. 100 at 61.) In support of its argument, Apple presented an expert witness, a POSITA, who stated in his deposition that "I think it would be at best, challenging and possibly not adequate, ever, for 'implication' to be counted as 'definition,'" meaning that the term "relying party" cannot be described based on other language in the patent. (Doc. 100-1 at 47:9–11.) However, the Federal Circuit has made clear that the specification may define terms by implication. See Irdeto, 383 F.3d at 1300 ("Even when guidance is not provided in an explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents"); see also Vitronics Corp. v. Conceptronic, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.").

The expert testified at the Markman hearing that because the term "relying party" is not defined in the '107 Patent, he attempted, through a "hierarchy of efforts," to define it by implication, but failed in doing so. (Doc No. 108 at 59:7–19.) But, as noted and as Apple recognizes, the term "relying party" appears over ninety (90) times within the '107 Patent's specification. From this usage as it appears in the specification, the implication is readily apparent. The relying party is the party who relies on the end user's cloaked email address to communicate with the end user—initially or in return—through the ID cloaking system.

16

In further support of its argument, Apple argues that because the specification states that there are "others," and not just "relying parties" that communicate with the end user, this provides no objective boundaries for what "relying party" means. (Doc. No. 100 at 63.) For example, Apple points to the portion of the specification that states:

> As such, given the tools above which cloak the user's desired information, the relying-party or **other** recipient, only has what information the end user wishes (e.g., an optional message text in the webform, checkboxes checked, etc.) plus the "cloaked" information from the ID cloaking system (e.g., confidential information placeholders).

(Doc. Nos. 100 at 63; '107 Patent at 9:47–52.) Apple argues that if "relying party" meant "the person or entity that the end user is communicating with through the ID cloaking system," then there could be no "others" or "other recipient[s]" as described in the specification. (Doc. No. 100 at 63.)

On this point, the Federal Circuit's decision in Retractable Techs., Inc. v. Becton, Dickinson & Co., 653 F.3d 1296 (Fed. Cir. 2011) is instructive. In Retractable, the Federal Circuit construed the term "body" in a claim covering medical syringes to mean a one-piece rather than a multi-piece body even where the claim language left open the possibility that the recited "body" could encompass a syringe body composed of more than one piece. 653 F.3d at 1304–05. The Court held that limiting the term "body" to a one-piece body was "required to tether the claims to what the specifications indicate[ed] the inventor actually invented." Id. at 1305. Applying that same rationale to the present case, even though the claim language indicates that there may be "others" that the end user communicates with: (i) the specifications, in describing the invention, indicate that the email system is limited to using a "relying party" email address; and (ii) the figures depict the function of the ID cloaking system as between only the end user and relying party. And as further explained by Rally, the "others" are essentially other

17

parties that the end user could communicate with who, in turn, do not go through the cloaking system.  (Doc. No. 108 at 130:13–16.)  The "relying party," on the other hand, has to be someone who is assigned a cloaked email address, which is tethered to "what the specifications indicat[ed] the inventor actually invented." Retractable, 653 F.3d at 1304–05.

Second, Apple asserts that "relying party" has no accepted ordinary meaning.  (Doc. No. 100 at 61, 73.)  Apple cites its expert's declaration that "relying party" "is not a term that a POSITA would have understood in the context of the electronic communications framework describes in the Asserted Patent."  (Doc. No. 100 at 61.)  However, "[p]atents should be interpreted on the basis of their intrinsic record, not on the testimony of such after-the-fact 'experts' that played no part in the creation and prosecution of the patent." Bell & Howell Doc. Mgmt. Prods. v. Altek Sys., 132 F.3d 701, 706 (Fed. Cir. 1997).  "[R]eliance on extrinsic evidence to interpret claims is proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence[.]" Id. (citing Vitronics Corp. v. Conceptronic Inc., 90 F.3d 1576, 1584 (Fed. Cir. 1996).  The intrinsic evidence discussed above eliminates any ambiguity surrounding the term "relying party," and therefore, no need exists to follow the testimony of Apple's expert.

Accordingly, because Apple has failed to carry its burden of demonstrating with clear and convincing evidence that the term "relying party" is indefinite and because a POSITA would reasonably understand the meaning of the term in light of the claims and specification language, the term is not indefinite.  Simply put, the intrinsic evidence confirms that a POSITA would understand "relying party" in its plain and ordinary meaning.

## V.    CONCLUSION

For the foregoing reasons, the disputed claim terms are construed as follows:

18

| Claim Term | Court's Construction |
|---|---|
| "cloaked end user address"<br>"cloaked relying party email address"<br>"cloaked . . . address" | "an anonymous email address assigned through the ID cloaking system to enable the exchange of emails from which the real email address of the parties cannot be determined." |
| "relying party" | Plain and ordinary meaning. |

An appropriate Order follows.