IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RALLY AG LLC,

              Plaintiff,

    v.

APPLE, INC.,

              Defendant.

CIVIL ACTION
NO. 23-1106

## OPINION

**Slomsky, J.**                                   **August 7, 2026**

## TABLE OF CONTENTS

I.     **INTRODUCTION** ................................................................................. 1

II.    **BACKGROUND** ................................................................................. 2

  A.   Factual Background ....................................................................... 2

    1.   The '107 Patent ...................................................................... 2

    2.   Defendant's "Hide-My-Email" ("HME") Feature ............................. 6

    3.   Plaintiff's Patent Infringement Allegation ...................................... 7

  B.   Procedural Background..................................................................... 8

    1.   Defendant's Motion for Summary Judgment.................................... 8

    2.   Plaintiffs' Opposition to Defendant's Motion for Summary Judgment ......... 9

    3.   Defendant's Reply in Support of its Motion for Summary Judgment ......... 10

    4.   Parties' Supplemental Briefs............................................................11

III.   **STANDARD OF REVIEW** .................................................................11

**IV.    ANALYSIS**..................................................................................................... 12

    A.    A Genuine Dispute of Material Fact Exists as to Whether HME Generates a Cloaked Relying Party Email Address. ........................................................... 13

    B.    A Genuine Dispute of Material Fact Exists as to Whether HME's End User Profile Contains a Previous Association Between the Relying Party Address and a Cloaked Relying Party Email Address. ......................................................... 16

**V.    CONCLUSION** ................................................................................................ 21

## I.    INTRODUCTION

This case arises out of Defendant Apple, Inc.'s ("Defendant") alleged infringement of U.S. Patent No. 11,361,107 ("'107 Patent") owned by Plaintiff Rally AG LLC ("Plaintiff"). (Doc. No. 35.)   The '107 Patent, titled "Privacy Friendly Communication by Operation of Cloaked/Decloaked Email," describes an "ID cloaking system" that enables communication through email between two parties without revealing their identities. (See generally the '107 Patent.)

On February 13, 2026, Defendant filed a Motion for Summary Judgment. (See Doc. No. 133.) In the Motion, Defendant asserts that it has not infringed the '107 Patent for two independent reasons: (1) the third-party replacement email addresses created by "Hide-My-Email"[1] ("HME") are not anonymous under the Court's claim construction; and (2) HME does not store any association between the third-party's real email address and the replacement address generated by HME. (Id.)

On March 13, 2026, Plaintiff filed a Response in Opposition, asserting that Defendant's HME system does generate a cloaked relying party email address, from which the real email address cannot be determined. (See Doc. No. 141 at 10.) Plaintiff further maintains that the HME system, literally or under the Doctrine of Equivalents, determines whether the end user profile contains a previous association between the relying party email address and the cloaked relying party email address. (Id. at 14.)

For reasons set forth below, Defendant's Motion for Summary Judgment (Doc. No. 133) will be denied.

---

[1]   "Hide-My-Email" is a feature of Defendant's products that "lets you create unique, random email addresses that forward to your personal inbox so you can send and receive email without having to share your real email address." (Doc. No. 35 ¶ 24.)

## II.    BACKGROUND

### A.    Factual Background[2]

#### 1.    The '107 Patent

Plaintiff is the owner of the '107 Patent, titled "Privacy Friendly Communication by Operation of Cloaked/Decloaked Email," which was issued by the United States Patent and Trademark Office on June 14, 2022.  (SAC ¶¶ 47–48.)  The '107 Patent was originally assigned to autoGraph Inc. ("Autograph") by its inventor, Brian Roundtree.[3]  (Id. ¶¶ 40, 48.)  Autograph was founded by Mr. Roundtree in early 2010 to "solve privacy issues around advertising while improving advertising performance."  (Id. ¶ 40.)  To solve these issues, Autograph "developed a series of products (and obtained related patents) around the general problem of user-controlled access to personal data and [personally identifiable information] without losing control of the data itself."  (Id. ¶ 42.)  In other words, Autograph's products focused on giving users a way to allow third parties to use their personally identifiable information without giving these third parties direct access to such information.  (Id.)  In connection with these products, Autograph developed an "email cloaking technology," which is the subject of the '107 Patent.  (Id. ¶¶ 45, 50.)

The '107 Patent is aimed at protecting the privacy of individuals communicating with third parties on the Internet.  (Id. ¶ 51.)  In simple terms, the '107 Patent describes an "ID cloaking system" that allows two parties communicating through email to do so without revealing their identities.  The ID cloaking system accomplishes this process by assigning each party an anonymous email address, intercepting each email sent between the parties, and replacing the "To"

---

[2]    The Factual Background discussed in Section II (A) has been adopted from this Court's prior Opinion on Motion to Dismiss for Failure to State a Claim.  (Doc. No. 52.)

[3]    Autograph transferred ownership of the '107 Patent to Plaintiff, which "is the current owner of all rights, titles, and interests in and to the '107 Patent."  (SAC ¶ 48.)

and "From" fields in the emails with each party's anonymous email address before forwarding the email to the appropriate party.  By assigning the parties anonymous email addresses, the '107 Patent aspires to solve the issue of data breaches, which is a common problem that plagues traditional email communications, specifically between consumers and merchants.  (See id. ¶ 34.) As the Second Amended Complaint ("SAC") notes, "it is rarely an option for a consumer . . . not to give out her personal information such as email information . . . and still conduct most any transaction in today's information centric economy."  (Id. ¶ 35.)  But by giving out their email addresses, these consumers put their private emails at risk of mass exposure through data breaches. And because "[m]odern consumers frequently have become the victims of data breaches," most consumers today are bombarded with "a steady stream of emails infected with malicious code (mass-mailing worms and viruses), unwanted product advertisements (spam), and requests for personal information from criminals masquerading as legitimate entities to enable the commission of fraudulent activity (phishing)."  (Id. ¶¶ 33–34.)

More specifically, the '107 Patent's ID cloaking system operates as follows.  The '107 Patent refers to the party initiating the anonymous email communications, typically the consumer, as the "end user," and the party receiving the anonymous email communications, typically the merchant, as the "relying party."  (See id., Exhibit A [hereinafter "'107 Patent"].)  As described in the SAC, an end user wishing to anonymously communicate with third parties, such as merchants as the relying party, can download a "web plugin browser extension" or "mobile device application" that is "configured to interact with the ID cloaking systems."  ('107 Patent at 7:51-55.)  With the downloading of the browser extension or mobile app, the '107 Patent's specification assumes that the end user will create "a profile/person with the identity cloaking system," at which time the end user can specify which information they want to keep private from third parties, such

3

as their email address.  (See id. at 7:58–67.)  If the end user chooses to keep their email address private, the ID cloaking system will create a cloaked email address for that end user.  (See id.)  The ID cloaking system stores this information in the end user's profile/persona.  (See id. at 8:10–11.)

If the end user decides they do not want to share their personal email with a relying party, the browser extension or mobile app will instead give the end user the option to use their cloaked email address.  (See id. at 8:26–31.)  For example, if an end user fills out a form on a merchant's website and the form requires the end user to input their email address, the ID cloaking system, acting through the browser extension or mobile app, will give the end user the option to fill in the form's email address field with the end user's cloaked email address.  Therefore, if the merchant chooses to email the end user in response to the completed webform, the merchant can only email the end user's cloaked email address, which the ID cloaking system will intercept.

To ensure that the ID cloaking system intercepts the email sent to the end user from the merchant/relying party, the end user's cloaked email address must end in the same domain as the domain associated with the ID cloaking system.[4]  (See SAC ¶ 56.)  This is accomplished when the end user creates a profile with the ID cloaking system, at which time the ID cloaking system assigns the end user a cloaked email address that ends in the same domain as the ID cloaking system.  (See '107 Patent at 7:58–67.)  For example, an end user using the de-cloaked email "example@gmail.com" would be assigned by an ID cloaking system using the domain "autograph.me," a cloaked email address of "example@autograph.me."  Because both the ID cloaking system and the end user's cloaked email address use the same domain "autograph.me," any email sent to this cloaked email address would first be intercepted by the ID cloaking system.

---

[4]   A domain is the portion of an email address that follows the "@" sign.  For example, the domain in "example@gmail.com" is "gmail.com."

Once intercepted, the ID cloaking system would "intelligently" swap the end user's cloaked email address for their de-cloaked email address.  (SAC at ¶ 61.)  To illustrate, the ID cloaking system would intercept an email sent to the end user's cloaked email address "example@autograph.me" and intelligently swap this cloaked email address for "example@gmail.com," which is the end user's de-cloaked email address.  Instead of "To: example@autograph.me," the email would now read "To: example@gmail.com."

When the ID cloaking system intercepts the relying party's email to the end user, the system will also "determine whether the end user profile contains a previous association between the relying party address and a cloaked relying party address."  (Id. ¶ 56.)  In other words, the ID cloaking system will search the end user's profile to determine whether the system has already assigned that particular relying party a cloaked email address.  (See id.)  If it has already done so, the ID cloaking system will swap the relying party's de-cloaked email address for its cloaked email address.  (See id.)  If the system has not already assigned the relying party a cloaked email address, the system will generate one, store the association between the relying party's cloaked and de-cloaked email addresses in the end user's profile, and then swap out the appropriate email addresses.  (See id.) When generating a cloaked email address for the relying party, the ID cloaking system will assign the relying party a cloaked email address that ends in a different domain than the relying party's de-cloaked email address.  (See id.)  For example, a relying party using the de-cloaked email "info@nordstrom.com" would be assigned by the ID cloaking system a cloaked email address of "info@autograph.me."  Once each party's respective cloaked and de-cloaked email addresses have been swapped in and out, the ID cloaking system will then forward the email to the end user's de-cloaked address, listing the relying party's "reply-to" address as its cloaked email.  (See id.)

5

As a result, if the end user chooses to reply to the relying party's initial email, all the end user must do is click "reply" and send the email back to the relying party's cloaked email address. (Id. ¶ 67.)  The ID cloaking system will again intercept the email and swap out each party's respective cloaked and de-cloaked addresses before forwarding the email to the relying party's de-cloaked email.  (See id. ¶ 56.)  Through this function, the ID cloaking system enables the parties to engage in anonymous email chain threading.  (Id. ¶ 61.)

### 2.    Defendant's "Hide-My-Email" Product

Plaintiff alleges that Defendant's website, https://www.Apple.com/, contains a feature which is a replica of the '107 Patent's ID cloaking system.  More specifically, Defendant allegedly "provides a mobile application in order to provide privacy measures to its customers and users, including but not limited to its 'Hide-My-Email' feature."  (Id. ¶ 12.)  Defendant introduced its "Hide-My-Email" feature in September 2021, as part of Apple's iOS 15 platform.  (Id. ¶ 24.) "According to Defendant, the 'Hide-My-Email' product 'lets you create unique, random email addresses that forward to your personal inbox so you can send and receive email without having to share your real email address.'"  (Id.)

Defendant's website provides that "[i]f you create an account with an app or visit a website that supports Sign in with Apple, you can choose to share your email address, if you're familiar with the app or visit a website, or hide your email address, if you'd prefer more privacy."  (Id. ¶ 25.)  Further, "[i]f you choose the Hide-My-Email option, only the app or website you created the account with can use this random email address to communicate with you."  (Id. ¶ 26.)  Finally, the SAC alleges that "[w]ith an iCloud+ subscription, you can generate unique, random addresses on your device with iOS 15, iPadOS 15, or macOS Monterey or later in any email field in Safari. You can also generate email addresses on-demand in the Settings app in iOS or iPadOS, in System

Settings or System Preferences in macOS, in the Mail app, or on iCloud.com. [I]n iOS 16 or iPadOS 16 or later, you can also keep your email address private in third-party apps." (Id. ¶ 27.)

### 3. Plaintiff's Patent Infringement Allegation

Plaintiff accuses Defendant of infringing on the '107 Patent through "all Apple devices, including iPhones and iPads, that have cloaking and decloaking capabilities." (Id. ¶ 11.) Specifically, Plaintiff asserts that Defendant infringes on Claim 13 of the '107 Patent. (See id. ¶¶ 78, 89.) Claim 13 provides the following:

> A non-transitory computer readable medium for a [sic] ID cloaking system having instructions stored thereon that are executable by processor electronics to: [5]
>
> > receive an email addressed to a cloaked end user address, wherein the email is sent from a relying party email address, and wherein the domain of the cloaked end user address and the domain associated to the cloaked ID system are the same domain;
> >
> > identify an end user specified address associated to the cloaked end user address by an end user profile;
> >
> > determine whether the end user profile contains a previous association between the relying party address and a cloaked relying party email address, wherein the relying party address has a different domain than the cloaked relying party email address;
> >
> > where the end user profile does not contain a previous association between the relying party address and the cloaked relying party email address, then generate a new cloaked relying party email address and associate the new cloaked relying party email address to the end user profile, the cloaked end user address, wherein the new cloaked relying party email address is generated with a domain different than the relying party address; and
> >
> > send the email to the identified end user specified address, wherein the email is configured with a reply-to email address comprising the new cloaked relying party email address.

---

[5] As explained by Defendant's counsel at a hearing before the Court on March 21, 2024, a non-transitory computer readable medium "refers to something like memory or a hard disk that would store information in the computer, and non-transitory refers to the idea that it is stored in some sort of durable fashion instead of just very, very briefly, like being transmitted over the internet." (Doc. No. 32 at 12:24–25, 13:1–3.)

(Id. ¶ 56 (quoting '107 Patent at 31:8–30, 32:1–4).)

### B.    Procedural Background

On October 5, 2023, Plaintiff filed their original Complaint against Defendant, asserting infringement of the '107 Patent (Doc. No. 1.)  On January 9, 2024, Plaintiff filed a First Amended Complaint ("FAC") (Doc. No. 20) and on May 3, 2024, filed a Second Amended Complaint ("SAC").  (Doc. No. 35.) Defendant moved to dismiss each of Plaintiff's Complaints for failure to state a claim upon which relief can be granted (Doc. Nos. 23, 24, 28, 41, 42)—this Court denied both Motions.

On October 8, 2025, this Court held a <u>Markman</u> hearing on four (4) disputed terms.  On October 27, 2025, the Court construed the four (4) disputed claim terms in an Opinion Resolving Claim Construction Disputes as follows:

| Claim Term | Court's Construction |
| --- | --- |
| "cloaked end user address" "cloaked relying party email address" "cloaked…address" | "an anonymous email address assigned through the ID cloaking system to enable the exchange of emails from which the real email address of the parties cannot be determined." |
| "relying party" | Plain and ordinary meaning |

(Doc. No. 110 at 19.)

### 1.    Defendant's Motion for Summary Judgment

On February 13, 2026, Defendant filed a Motion for Summary Judgment.  (Doc. No. 133.) Defendant made two arguments in support of its Motion.  (<u>See</u> Doc. No. 134 at 10, 13.)[6]  First, Defendant argues that the third-party replacement email addresses created by HME ("Hide-My-

---

[6]    Doc. No. 134 is Defendant's Opening Brief in support of its Motion for Summary Judgment of Noninfringement.

Email") are not anonymous under this Court's claim construction. (Id. at 11.) To this point, Defendant asserts that there is no dispute regarding how HME works, and thus the matter is appropriate for summary judgment. (Id. at 12.) Second, Defendant asserts that HME does not store any association between the third-party's real email and the replacement address generated by HME. (Id. at 13.) Defendant maintains that HME generates a third-party replacement email address from the third party's real email address each time HME receives an incoming email addressed to an HME end user alias. (Id.)

### 2.    Plaintiffs' Opposition to Defendant's Motion for Summary Judgment

On March 13, 2026, Plaintiff filed their Opposition to Defendant's Motion for Summary Judgment, submitting that there are genuine disputes of material fact regarding whether Defendant's accused HME system infringes on two claim elements of the '107 Patent. (Doc. No. 141).

First, Plaintiff argues that Defendant's HME system generates a cloaked relying party email address from which the real email address cannot be determined—an argument supported, according to Plaintiff, in the Declaration of Dr. Eric Koskinen, Plaintiff's expert witness. (Id. at 8, 14.)

Second, Plaintiff asserts that HME does make a determination whether the end user profile contains an association between the relying party email address and the cloaked relying party email address. (Id. at 13–14.) Plaintiff maintains that, since there is no dispute to how HME generates the cloaked email address—utilizing the same input and algorithm each time—Defendant is infringing on the '107 Patent, either literally, or under the Doctrine of Equivalents. (Id.)

9

### 3.    Defendant's Reply in Support of its Motion for Summary Judgment

On March 27, 2026, Defendant filed a Reply in Support of its Motion for Summary Judgment. (Doc. No. 151.)   First, with regard to whether the third-party replacement email address is "cloaked" under this Court's construction, Defendant and Plaintiff agree on the changes that are made to the third-party email address. (Id. at 2.)   Defendant argues that the formatting changes are "trivial," and that the real email address can be easily determined from the cloaked address. (Id. at 3.)   Thus, Defendant maintains that whether the HME third-party replacement email addresses meet the Court's claim construction is a question of law, not fact. (Id. at 1.)

Second, Defendant contends that, if mere generation of the cloaked relying party address alone satisfies the requirement to "determine whether the end user profile contains a previous association," then the "determine" step is meaningless. (Id. at 7.)   Defendant further contends that HME always generates the same replacement address from the third-party email address, and thus no determination is needed or performed—unlike the Asserted Patent. (Id. at 8.)

Defendant further argues that, even if the address itself were "an association," it is not the claimed "previous association," as the email is generated every time, regardless of whether any prior association between the parties exists. (Id.)

Regarding Plaintiff's argument on Doctrine of Equivalents, Defendant argues that it fails as a matter of law.   In Plaintiff's Patent Owner Preliminary Response ("POPR")[7] argument, Defendant contends that Plaintiff's invention is distinguished from prior art "with respect to the 'determining'

---

[7]   POPR (Patent Owner Preliminary Response) is limited to setting forth the reasons why no inter partes review should be instituted.   Inter partes review is a trial proceeding conducted at the United States Patent and Trademark Office to review the patentability of one or more claims in a patent on the basis of—among other claims—prior art consisting of earlier patents or printed publications.

and 'generating' limitations." (Id. at 9–10.)  Defendant contends that prosecution history estoppel[8] precludes Plaintiff from advancing this argument.  (Id.)

### 4.  Parties' Supplemental Briefs

On April 21, 2026, the Court held a hearing on the Motion for Summary Judgment.  At the hearing, the Court ordered that the parties may file supplemental briefs. (Doc. No. 163 at 101:17–19.)  On May 8, 2026, the parties filed supplemental briefs. (See Doc. Nos. 165, 167.)

## III.   STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.   Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)).  A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Kaucher v. Cty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  For a fact to be considered "material," it "must have the potential to alter the outcome of the case."  Favata, 511 F.  App'x at 158.  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue

---

[8]   Prosecution history estoppel prevents a patentee "from using the doctrine of equivalents to recapture subject matter surrendered from the literal scope of a claim during prosecution." Trading Techs. Int'l, Inc. v. Open E Cry, LLC, 728 F.3d 1309, 1322 (Fed. Cir. 2013).

of material fact exists and that a reasonable factfinder could rule in its favor." Id. (quoting Azur, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (alteration in original) (quoting Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009)). The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. Anderson, 477 U.S. at 247–49. Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the court must credit the nonmoving party's evidence over that presented by the moving party. Id. at 255. If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. Id. at 250.

## IV.    ANALYSIS

As explained supra, Defendant has moved for summary judgment on two grounds. First, Defendant contends that there is no genuine dispute that the Hide-My-Email ("HME") third-party replacement email address is not anonymous and that the real email address can be determined from it, thus not meeting the Court's claim construction. (Doc. No. 134 at 11.) For this reason, Defendant maintains that the HME system does not infringe on the Asserted Patent.

Second, Defendant argues that HME does not store any association between the original third-party email address and the replacement third-party email address. (Id. at 13.) Defendant further argues that the HME system generates the same third-party replacement email address every time using an algorithm. (Id.)

The Court will address each claim in turn.

12

### A. A Genuine Dispute of Material Fact Exists as to Whether HME Generates a Cloaked Relying Party Email Address.

Defendant moves for summary judgment of noninfringement, arguing that the Hide-My-Email ("HME") feature does not generate an "an anonymous email address assigned through the ID cloaking system to enable the exchange of emails from which the real email address of the parties cannot be determined," as required by the Court's claim construction. (Doc. No. 134 at 11.) For reasons explained more fully below, summary judgment will be denied.

A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States . . . during the term of the patent[.]" 35 U.S.C. § 271(a). An infringement analysis entails two steps: (1) determining the meaning and scope of the patent claims; and (2) comparing the construed claims to the accused product. Markman v. Westview, Instruments Inc., 517 U.S. 370, 384 (1996). The first is a question of law, whereas the second a question of fact. Id. Where "the parties do not dispute any relevant facts regarding the accused product…but disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment." Duncan Parking Techs., Inc. v. IPS Grp., Inc., 914 F.3d 1347, 1363 (Fed. Cir. 2019).

Defendant contends that there is no factual dispute because both parties agree how HME generates the accused email addresses. Defendant relies primarily on the declaration of Plaintiff's technical expert, Dr. Eric Koskinen[9]:

> Q: [W]hether at a high level or at a low level, I don't see anywhere in your report where you dispute any aspect of Apple's description of how the alleged cloaked relying party email address is calculated; is that correct?

---

[9]   Plaintiff's technical expert, Dr. Eric Koskinen, is an Associate Professor at Stevens Institute of Technology. (Doc. No. 145 ¶ 6.) Dr. Koskinen has a Ph.D. in Computer Science from the University of Cambridge, a Master's Degree in Computer Science from Brown University, and an Undergraduate Degree with Highest Honors in Computer Science and Physics from The College of William and Mary. (Id. ¶ 7.) He has served as a consultant for over a decade, where he has provided software-related services to law firms and corporations. (Id. ¶ 6.)

13

A:  I think -- For the purpose of this report, that was not something that I focused on, i.e., the accuracy of Apple's description. So that's not something that I included in my declaration, which was focused more on whether the result was anonymous.

(Doc. No. 151 at 2; Ex. 7 at 10:13–11:3.)  From this testimony, Defendant argues that the parties' disagreement concerns only the legal effect of undisputed facts and, therefore, may be resolved on summary judgment under O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd., 521 F3d 1351 (Fed. Cir. 2008).  (Doc No. 134 at 12.)

Defendant's reliance on O2 Micro is misplaced.  There, the Federal Circuit held that when parties present "a fundamental dispute regarding the scope of a claim term," it is the court's duty to resolve that dispute before submitting infringement to the jury.  Id. at 1361–62.  Here, however, the Court has already construed the disputed term "cloaked relying party email address" to mean "an anonymous email address assigned through the ID clocking system to enable the exchange of email from which the real email address of the parties cannot be determined."  (Doc. No. 111 at 13.)  Neither party asks the Court to revisit that construction.  Rather, the parties dispute whether HME satisfies the claim construction as construed.  That is a question of infringement, not construction.

Indeed, the Federal Circuit has recognized that "a sound claim construction need not always purge every shred of ambiguity."  Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc., 815 F.3d 1314, 1318 (Fed. Cir. 2016) (internal citations omitted).  In addition, "the court's obligation is to ensure that questions of the scope of the patent claims are not left to the jury…[and] in order to fulfill this obligation, the court must see to it that disputes concerning the scope of the patent claims are fully resolved."  Every Penny Counts, Inc. v. Am. Express Co., 563 F.3d 1378, 1383 (Fed. Cir. 2009).  But once the Court has construed the claims "with whatever specificity and precision is warranted," the task of determining whether the accused product meets the construed

14

claim is for the finder of fact.  PPG Indus. v. Guardian Indus. Corp., 156 F.3d 1351, 1355 (Fed. Cir. 1998).

Here, the parties dispute whether HME generates an anonymous email address "from which the email address of the parties cannot be determined."  Defendant emphasizes that HME merely reformats the relying party's email address by replacing the "@" sign with "_at_" and periods with underscores while leaving the underlying address plainly readable.  (Doc. Nos. 134 at 8, 11; 151 at 3–4.)  Defendant illustrates the transformation as follows:

| Third-Party Real Email Address | Transformed Third-Party Email Address |
|---|---|
| clarksmith3435@gmail.com | Clarksmith3435_at_gmail_com_zmng3730m2dc68_3bs93548@icloud.com |

(Id.)  According to Defendant, because the relying party's real email address appears at the beginning of the generated email address in human-readable[10] form, HME cannot satisfy the Court's claim construction.  (Doc. No. 134 at 11.)

Plaintiff disputes that characterization.  While Plaintiff does not dispute that HME replaces the "@" symbol and periods, Plaintiff maintains that those formatting changes constitute only one component of HME's algorithm and do not establish that the generated email address reveals the relying party's actual email address to an end user.  (Doc. No. 141 at 10–12.)  In support, Plaintiff relies on Dr. Koskinen's declaration, in which he states:

> …Apple's algorithm for generating the cloaked relying party email address substitutes a different alphanumeric local name and domain name for the address. Therefore, an end user, when provided only the text of the cloaked relying party email address, would not know the verified identity of the author.

---

[10]   Human-readable form is data or information that can be read by humans without needing a computer or special decoding tools. https://opendatahandbook.org/glossary/en/terms/human-readable/ (last visited July 31, 2026).

(Doc. No. 145 at 15.)  Dr. Koskinen further opines that HME generates the cloaked relying party email address using five different inputs, including an anonymous identifier and hash-based message authentication code ("HMAC") secret.  (Id.; see also Doc. No. 135 ¶ 1.)  In his opinion, an end user viewing only the generated address—and lacking knowledge of Apple's algorithm—could not determine the relying party's real email address.  Defendant disputes Dr. Koskinen's conclusion, but has not offered competing expert testimony addressing whether an end user could determine the relying party's identity from the generated address.

Defendant argues that Koskinen's declaration cannot create a genuine dispute of material fact because the relying party's email address appears in plain text at the beginning of the generated address.  That argument, however, asks the Court to accept Defendant's interpretation of the technical evidence over Plaintiff's.  But at the summary judgment stage, the Court must view the evidence in the light most favorable to the non-moving party, which here, is Plaintiff.

Viewed in that light, Dr. Koskinen's declaration creates a genuine dispute of material fact as to whether HME generates "an anonymous email address assigned through the ID cloaking system to enable the exchange of emails from which the real email address of the parties cannot be determined."  A reasonable jury could credit Defendant's position that HME merely reformats the relying party's email address, or it could credit Dr. Koskinen's opinion that the generated email address is anonymous.  Because resolving that dispute requires the jury to evaluate competing evidence regarding whether HME generates an anonymous email address, summary judgment is inappropriate.

**B. A Genuine Dispute of Material Fact Exists as to Whether HME's End User Profile Contains a Previous Association Between the Relying Party Address and a Cloaked Relying Party Email Address.**

Next, the Court turns to Defendant's challenge regarding the 'determination' and 'association' limitations of Claim 13 in the '107 Patent, which is two-fold. First, Defendant

16

contends that, unlike the '107 Patent, HME does not "determine whether the end user profile contains a previous association between the relying party address and a cloaked relying party email address." (Doc. No. 134 at 13.) Second, Defendant argues that the HME feature does not infringe on the '107 Patent provision that: "where the end user profile does not contain a previous association between the relying party address and the cloaked relying party email address, then generate a new cloaked relying party email address and associate the new cloaked relying party email address to the end user profile." (Id.; see generally the '107 Patent.) Plaintiff responds that HME performs the determination step implicitly and that the claimed association is contained within the end user profile because the profile includes the algorithm used to generate the cloaked relying party email address. (Doc. No. 141 at 13–14.) Because genuine disputes of material fact remain regarding whether HME satisfies these limitations, Defendant's Motion will be denied.

Whether an accused product infringes a patent, either literally or under the Doctrine of Equivalents, is a question of fact. Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed. Cir. 1998). Literal infringement requires that every limitation of the asserted claim be present in the accused product. Duncan Parking Techs., Inc., 914 F.3d at 1360.

Claim 13 of the Asserted Patent provides, in relevant part:

[D]etermine whether the end user profile contains a previous association between the relying party address and a cloaked relying party email address, [and]
where the end user profile does not contain a previous association between the relying party address and the cloaked relying party email address, then generate a new cloaked relying party email address and associate the new cloaked relying party email address to the end user profile, the cloaked end user address[.]

(See '107 Patent, Claim 13.)

Defendant argues that HME does not perform this two-step process. According to Defendant, HME does not determine whether a prior association exists because it always generates the same replacement email address using the same algorithm whenever it forwards an email to an

17

HME alias.  (Doc. Nos. 134 at 13; 151 at 6.)  Because HME neither checks for nor stores a previous association between the relying party email address and the cloaked relying party email address, Defendant contends that it cannot literally satisfy either the 'determination' or 'association' limitations.

Plaintiff disputes this characterization.  Relying on Dr. Koskinen's declaration, Plaintiff argues that HME implicitly performs the claimed determination and creates the required association through its algorithm rather than by storing the association in a database.  Dr. Koskinen explains that HME's source code[11] is designed to determine implicitly that no prior association exists before generating the cloaked relying party email address.  (Doc. No. 145 ¶ 65.)  He further opines that because the algorithm uses the relying party email address and the cloaked end user address as inputs to generate the cloaked relying party email address, the association is contained within the end user profile itself.  (Id. ¶ 66–70.)

Defendant emphasizes that Dr. Koskinen admitted that there is no source code capable of determining whether a prior association does exist.  During his deposition, he testified:

Q:  So there is no code that you're aware of in the accused products that is capable of making a determination that the end user profile does contain a previous association between the [relying] party address and the cloaked relying party address?

A:  The code implicitly makes the decision, the determination, that there is no previous association. And indeed there is no code that pertains to the situation in which a relying party email address -- there was a previous available one and, instead, it immediately implicitly makes the determination that there was no previous association and proceeds to generate one.

---

[11]  Source code is "a convenient expression of one or more processes that may be turned by a programming system into equipment executable form."  15 C.F.R. § 772.

(Doc. No. 151 at 7; Ex. 7 at 126:12-127:2) (cleaned up).    Defendant argues this testimony establishes that HME cannot satisfy Claim 13 because the claimed determination necessarily requires the ability to identify both the existence and absence of a prior association.

However, Dr. Koskinen's testimony does not eliminate the factual dispute.  Although he acknowledged that HME lacks a code path for handling an existing association, he consistently maintained that HME implicitly performs the claimed determination and forms the required association through the algorithm used to generate the cloaked relying party email address rather than by storing that association.  He further explained that generating data algorithmically instead of storing it reflects a well-known computer science principle known as the "space-time tradeoff."[12]  (Doc. No. 145 ¶ 70.)  Thus, while the parties agree that HME does not physically store the association, they fundamentally disagree whether Claim 13 requires storage at all.  (Doc. Nos. 141 at 13; 145 ¶ 68; 151 at 6.)

Dr. Koskinen's opinions are sufficient to create a genuine dispute of material fact.  In Fintiv, Inc. v. Apple Inc, the Federal Circuit held that summary judgment of non-infringement was improper where the patentee presented sufficient technical evidence from which a reasonable jury could find that the accused product satisfied the disputed claim limitation, even though the expert could not identify the precise source code implementing that limitation.  No. 2023-2208, 2025 WL 1419363, at *8, *13 (Fed. Cir. May 16, 2025).  Likewise, the Federal Circuit has held that circumstantial technical evidence supporting a reasonable inference of infringement precludes summary judgment.  Vita-Mix Corp. v. Basic Holding, Inc., 581 F.3d 1317, 1326 (Fed. Cir.

---

[12]  In regard to "space-time tradeoff," Dr. Koskinen explains that generated data may be implemented either as a virtual column, which is computed when read and not stored, or a stored column, which is computed once and stored, reflecting a standard implementation choice between recomputation and storage.  (See Doc. No. 145 ¶ 70) (citing https://dev.mysql.com/doc/refman/8.4/en/create-table-generated-columns.html).

19

2009) (vacating summary judgment because circumstantial evidence created a genuine dispute of fact regarding infringement).

Here, Dr. Koskinen offers a technically supported explanation that HME satisfies the "determination" and "association" limitations because the association is embodied in the algorithm used to generate the cloaked relying party email address, rather than stored as a separate mapping in the end user profile. Defendant disputes that conclusion and argues that Claim 13 requires a stored association and express determination. Those arguments, however, challenge the persuasiveness of Dr. Koskinen's opinions, not their sufficiency. At summary judgment, the Court may not weigh the evidence or resolve competing inferences in Defendant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."). Viewing the evidence in the light most favorable to the non-moving party, a reasonable jury could credit Dr. Koskinen's opinions and conclude that HME includes the disputed limitations.

Accordingly, Defendant's Motion will be denied. Because genuine disputes of material fact preclude summary judgment on Plaintiff's theory of literal infringement, the Court need not address Defendant's alternative argument that HME does not infringe under Doctrine of Equivalents.[13]

---

[13] Under the Doctrine of Equivalents, a product that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is equivalence between the elements of the accused product and the claimed elements of the patented invention. See generally Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17 (1997).

**V.    CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. No. 133) will

be denied.  An appropriate Order follows.